## MAY TERM, 1876.

In the matter of the probate of the will of CHARLES WINTERMUTE, deceased.

1. A testator, sixty-seven years of age at the time of the execution of his will, and somewhat enfeebled by disease, was held, under the evidence in the cause, to have been possessed of testamentary capacity.

2. A failure of memory in stating, as a witness in a suit, nine months after the execution of the will, and when enfeebled with illness so severe as to endanger his life, that he had given his wife a part of his personal estate, when he had given her none, *held* to be no criterion of the condition of testator's mind at the time he executed the will.

3. That testator made no provision for his wife, is no reason for refusing probate on the ground of unnaturalness, especially when it appears that she had been cruel and unkind to him, and driven him from the house, and had surreptitiously taken papers, notes, and other evidence of indebtedness, and was holding them, and refused to give them up to him at the time of the execution of his will.

In the matter of the will of Charles Wintermute.

4. Costs will not be allowed, unless in an extreme case, to an unsuccessful party in contesting a will.

5. Where testimony in opposition to the probate of a will has been protracted to a most extraordinary and unnecessary extent, and much of it is utterly incompetent, costs, which might otherwise have been given, will be denied.

*Mr. W. H. Morrow*, for proponent.

*Mr. W. Luse* and *Mr. J. G. Shipman*, for caveatrix.

THE ORDINARY.

The testator, Charles Wintermute, died in January, 1874. The paper propounded as his will is dated on the 14th of September, 1872. It was executed in Newton, in Sussex county, where it was drawn by Mr. Thomas Anderson, of the firm of Anderson and Johnson, lawyers of that place, and was executed by the testator in the presence of both of those gentlemen, as attesting witnesses, and they signed it accordingly. The testator, at the time of its execution, was nearly sixty-seven years old, and he was somewhat enfeebled by disease. He had been twice married. By his first wife, he had eleven children, all of whom were living at the date of the will. After her death, he married the caveatrix, in August, 1855. The probate of the will is opposed on the ground of the alleged incapacity of the testator and undue influence, which, the caveatrix insists, was exerted over him by certain persons, among whom were the proponent, Lemuel F. L. Wilson, the executor named in the will; Isaac B. Wintermute, a son of the testator, and John N. Newman, one of testator's sons-in-law. By the will, the testator gave all his property to his children. It appears, by the evidence, that he and the caveatrix were not, at the date of the will, living happily together. The character of their relations to each other is shown by the fact that in July, 1872, he, by reason of differences then existing between them, left his house and slept in the barn for four or five consecutive nights. Though the caveatrix states that that was the only occasion on which

there was any serious rupture between them, the testimony shows, beyond all question, that there were numerous other occurrences of which he complained bitterly, alleging grievous ill-treatment at her hands and at those of some of her relations. Among other things, he complained of her having abetted one of her nieces, who was visiting her, in abusing him by word and deed, in August, 1872, in a transaction in which she and her niece, after he had forbidden the latter to take his horse, went to the stable and took the horse out, and, on his re-taking it from them, she struck him, using coarse, violent, and abusive language towards him. He also complained, and it seems with reason, that his wife had taken away from him his valuable papers, his notes, mortgages, &c., and refused to give them up to him. He complained, also, that she had taken to her own use, against his will, the proceeds of products of his farm, to a large amount, sold by her. In this situation of affairs, with his wife in hostility to him, he sent to Newton and caused to be drawn a letter of attorney, authorizing one of his neighbors, Lemuel F. L. Wilson, to collect all moneys due or to become due to him, and to that end to take his papers and securities into his possession, and to lease his lands and receive the rent from them, or to sell all his personal property, except notes, bonds, and other choses in action, and to invest his money. This letter of attorney was executed by him on or about the 7th of September, 1872. It proved insufficient for the purpose which it was mainly intended to answer. His attorney could not obtain possession of his papers by means of it. He then went to Newton with Mr. Wilson, and consulted with Mr. Anderson in relation to his affairs. The latter advised him to make his will, and in order to get his papers out of the hands of his wife, and to keep his affairs out of her control, to execute a deed conveying his property to trustees. The will was drawn and executed, but the testator took the making of the trust deed into further consideration, and it was not, in fact, executed until about five days afterwards, and it was then drawn in Belvidere. The formalities required by the

In the matter of the will of Charles Wintermute.

statute were all observed in the execution of the will. The subscribing witnesses testify distinctly, to the testator's capacity at the time. Mr. Anderson, having said that, in his judgment, the testator was of sound and disposing mind and memory when he executed the will, was asked by the counsel of the caveatrix for the grounds of his belief. He answered as follows: "My judgment or opinion was based upon what I heard Mr. Wintermute say during that visit, prior to the making of the will; he talked and acted like a man who was in full possession of his mental faculties; he seemed to know what he was talking about, in making the disposition of his property that he did by the will; he seemed to me to be acting from reasonable motives, and I saw nothing in his conversation about his business affairs, which indicated any mental derangement, or such mental imbecility as would disqualify a man from making a valid will; his mind appeared to be troubled about his difficulties with his wife, and he appeared to be suffering from bodily disease, but he seemed to understand, perfectly, the nature of the business he was doing, in making the will; in the conversation which I had with him the day before the will was drawn—I mean at the time I advised him to appoint a trustee—he seemed perfectly rational, talked about his troubles with his wife like a man who knew what he was talking about, and I could not then detect, either in his manner or his language, any sign of mental derangement, aberration, or imbecility. When I advised him to appoint a trustee, if my recollection serves me, and I am quite confident it does, he said that he would take time to consider the proposition to appoint a trustee; I thought that showed deliberation and caution on his part, because I informed him fully of the effect and force of a trust deed, explained to him that it would transfer his property from himself to his trustee, and enable the trustee, if so disposed, to set him at defiance, and that if he should appoint a trustee, the person selected by him should be some one in whom he could place undoubting confidence; he seemed to appreciate the fact that such a step on his part would be one

In the matter of the will of Charles Wintermute.

of grave importance, and one which ought to be thoroughly considered by him before taking action upon it." Mr. Robert T. Johnson, the other witness to the will, says, that at the time when the testator signed his name to the will, he was, in the witness' judgment, of sound and disposing mind and memory, and he says he bases his opinion upon the fact that he had considerable conversation with him at the time, in regard to his business, and he saw nothing in his manner or conversation which denoted anything but a sound mind. After the will was drawn, and before it was executed, Mr Anderson read it over and explained it to the testator, who, after the reading was finished, expressed his entire satisfaction with it. Mr. Johnson says, the testator said his wife had been acting badly; that she had drawn a knife on him, and had made threats against him ; that he was afraid of his life, and that she had taken a portion of his property without his consent, and that he did not think, from the manner in which she had treated him, that she deserved to have any of his property. He says, the testator gave the directions to Mr. Anderson immediately before the will was drawn, and in his presence, and that he noted a part of the directions on paper for Mr. Anderson. According to the testimony of Messrs. Anderson and Johnson, it is clear that the testator, at the time of the execution of the will, had testamentary capacity, and was fully aware of the effect of that instrument upon his property, and of the claims of his wife and children upon him. Nor is there any evidence to the contrary in the fact that in giving to Mr. Anderson the names of his eleven children, he omitted the name of one, (it appears that he at once, as soon as the omission was observed, properly supplied it by giving the name of his son Andrew,) or in the fact that in giving those names he omitted the middle initial of some of them, or in the circumstance that when the will was read over to him, before signing, he was described therein as resident of the county of Sussex. Mr. Johnson says he discovered the omission of the name of one of the children when the comparison of the names on the list, which had been made of the names of the children as

In the matter of the will of Charles Wintermute.

given by the testator, with the names in the will, was made, and he says he thinks the testator also mentioned it. The omission of the middle initial of the names of some of the children, is a matter of no importance, and as to the mistake in stating the residence of the testator, Mr. Johnson testifies that when the will was read over, before signing, he discovered the error, and it was at once corrected. The testator appears to have spoken freely, fully, intelligently and accurately of the occurrences between him and his wife, of which he complained, and which led him to make a will so that she might not have any part of his personal estate after his death. It is urged, however, as evidence of his incapacity, that subsequently to the execution of the will, when he was under examination on the 14th of June, 1873, as a witness in a suit brought in the Court of Chancery of this state, by the trustees, against him and his wife, to obtain possession of his papers still withheld by her, he did not remember the contents of his will, and was then under the impression, and so testified, that by it he had given to his wife a part of his personal estate. It is, in the first place, to be remarked, that the examination in question took place nine months after the execution of the will, and that, therefore, his mental condition at that time is by no means to be accepted as a criterion as to the condition of his mind on the 14th of September, 1872; and in the next place, the testator was, at the time of this examination, confined to his bed with illness so severe as to endanger his life, was exhausted by the heat of the weather, and confused by the questioning to which he was subjected. And again, it appears in evidence that five days afterwards, in the same examination, he testified that after the parties had left, after the examination on the 14th of June, and all had gone to bed, his recollection returned to him, and that he then remembered talking to Mr. Anderson about his wife's "going on" and abusing him, and that he then told Mr. Anderson that "he wanted the will made in that way; that she had her share, and more, of the 'loose property,' and that, therefore, the 'land property' she must have, of course; that then Mr. Anderson 'went at

In the matter of the will of Charles Wintermute.

it' and wrote it just as he had told him to write it at that time; that Mr. Anderson read it and called Mr. Johnson, and they two signed it; that he told Mr. Anderson he wanted the 'loose property' to go to the children, and that the reason he did not have any provision made for his wife in the will, was that he thought she had her share of the 'loose property.'" He proceeded to give reasons for saying that she had had her share of his personal property. There is nothing in the examination of the testator, except the temporary forgetfulness as to the contents of his will on the 14th of June, explained by the circumstances above mentioned in that connection, to indicate any want of testamentary capacity, even at the time of that examination, though the testator was confined to his bed with illness, and as before mentioned, it was nine months after the execution of the will. Moreover, he appears to have had no disposition, either then or at any time subsequently, to change the testamentary disposition he had made. But it is insisted, on the part of the caveatrix, that there is positive evidence of incapacity, in the testimony of witnesses who were well acquainted with the testator, and who regarded him as being incompetent to make a will at the time when the will was signed. Of those who were produced by her, Andrew N. Snover, and the testator's son-in-law, Philip Johnson, are confidently relied upon as having had abundant opportunity for observation, and as not being liable to objection or criticism on the score of interest in the subject matter of the controversy; the former having, as is alleged, no interest whatever in it, and the interest of the latter lying in the direction of support of the will. The facts testified to by them, as the basis of their opinion as to the incompetency of the testator, by no means warrant their conclusion, and the dealing of both of them with him during all the period of his alleged incompetency, not only manifested no doubt on their part, as to his mental capacity, but showed their belief in his competency. This is notably illustrated by their effort to bring about a settlement between him and his wife, after the existence of the will was known. Johnson ap-

pears not only to have arranged, as he supposed, a settlement with the testator, in June, 1873, but he and the caveatrix, by artifice, by the unfounded allegation that the testator, who was then under examination in the suit in Chancery before referred to, was too ill to proceed with his examination, obtained delay in those proceedings, in order to conclude the settlement without the influence of the trustees or their counsel. The terms of that settlement, according to Johnson's testimony, were, that the caveatrix was to pay her own costs and expenses of the litigation, and the testator was to pay his, and she was, at his death, to have one-third of all his property, real and personal, which would remain after deducting those costs and expenses, on his part, and was to have from him a guarantee to that effect. He was to pay her $300, and she was to provide her own support from that time forward. She was to give up to him, or to any one he should name, all the papers belonging to him, which she had in her possession. Johnson testifies that the testator was anxious to carry out this arrangement, and to that end was desirous of having the proper papers drawn and executed ; that he told Johnson he wanted his trustees to consent to it ; and he further says that the testator said, when he declined to carry out the proposed settlement, that some one of the trustees had told him that the terms were not as Johnson had told the testator they were. Johnson says he knew the testator understood the terms, and that the latter said he would be very glad to have the matter settled, and wanted it settled while he was living ; that he requested that the lawyers intrusted should know nothing about it, for he was afraid they would bring up some objection and interfere with the settlement. In all this proposed adjustment of the difficulties between the testator and his wife, there is no intimation whatever of any want of capacity on the part of the testator, but, on the other hand, he was evidently regarded as being in all respects competent to contract on the subject of the relations between him and his wife, and the disposition and control of his entire estate. The same observation applies to the testimony of Mr. Snover. The opinion

In the matter of the will of Charles Wintermute.

of Samuel H. Lanterman, as to the testator's want of capacity
about the time of making the will, also, is not sustained by
the facts he adduces to support it.    The testator, in the con-
versations which the witness gives, appears to have had accu-
rate memory, and, indeed, none of the things which the wit-
ness says were said and done by the testator, and which he
adduces as the grounds of his judgment, lead to the conclu-
sion which he professes to have reached as to the testator's
want of capacity.    It may be observed, that he appears to
have taken much interest in behalf of the caveatrix, in this
controversy.    William C. Larzalier, another of the witnesses
produced by the caveatrix on the subject of capacity, appears
to have founded his opinion mainly on the physical condition
of the testator.    He says he was dull and stupid, and that he
spoke in a low tone of voice, and was languid.    The testator
was sick at the time.    The witness states an instance in which,
in a business transaction between him and the testator, in the
winter of 1871–2, in regard to a life insurance, which one of
the testator's sons proposed to obtain upon his own life, he
had a conversation with the testator on the subject, and another
subsequent conversation, a few days afterwards, in which
latter conversation the testator exhibited a want of memory
with regard to the matter.    The circumstances are not stated
with sufficient particularity and definiteness to enable me to
judge whether they did, in fact, indicate a want of capacity at
the time.   At most, they exhibited a failure of memory, which,
judging from the other testimony in the cause, was temporary
merely, and probably attributable to the severe illness from
which the testator had been suffering.    Marshall Hunt
testifies that the sickness which the testator had in 1867,
had weakened his mind, yet it appears that this witness
was engaged in the effort to make a settlement between the
testator and his wife, in June, 1873, and according to his own
statement, treated the testator as a man of sound mind, memory
and understanding at that time, as he must certainly be pre-
sumed to have done under the circumstances.    Abraham
Hill's testimony on the subject is unimportant.    His opinions

are evidently based on the testator's physical condition as affected by age and illness. The testimony of Jacob L. Swayze, notwithstanding the witness' opinion as to the testator's incompetency, contains no fact from which a conclusion against the testator's capacity to make a testamentary disposition of his property, can fairly be deduced. On the other hand, it is evident that the witness did not regard the testator as being incompetent to transact business. The testator appears to have had money on deposit in the bank of which the witness was the cashier, and to have drawn it out by check as occasion required. Besides, in the investment made for him by the witness on the Struble mortgage, on or about April 1st, 1869 or 1870, and to which the witness refers as an occasion on which the testator exhibited unsoundness of mind in the witness' opinion, the testator appears not only to have taken part in the discussion as to the investment, but his inclination to loan the money to a friend, (or distant relation,) named Titman or Sipley, in Pennsylvania, had to be overcome by the witness, who recommended that the money be loaned to Struble. The witness says, in substance, that the testator said they proposed to make the loan to their friend, (or distant relation,) and talked about the rate of interest, and seemed to be anxious to make the loan and reluctant to take the witness' advice, because the testator preferred to make the loan to his friend or distant relation. He also says that the testator asked him from what date he would allow him interest on the loan if made to Struble. The testimony of John Lance is subject to the same general observations that have been made in respect to the testimony of Jacob L. Swayze. The opinions of these witnesses, (they are none of them experts,) are in themselves of no weight, except as they are sustained by the facts adduced in support of them, and the facts on which they rest are either inconsequential or inconclusive. They are all outweighed by proof of the efforts made in behalf of the caveatrix, by herself, her lawyer and others in June, 1873, to effect a settlement with the testator, by which his capacity to transact that business, involving, as before remarked, the dis-

position of his estate, is conceded. There is, however, other evidence in the cause in favor of the testator's capacity. The testator's brother Frederick, Marcus J. Lambert, John L. Teel, John Messler, Thomas Drumm, Philip L. Garrison, Alfred F. Fellows, Levi H. Newman and William M. Perrine all testify to his capacity. It is unnecessary to particularize or dwell upon their testimony. It may be remarked that the testator held office in the township, almost if not quite continuously, from 1848 until he moved away; and from 1867 to 1872, when he moved out of the township, he held the office of commissioner of appeals in cases of taxation. Dr. John C. Johnson also testifies to his capacity. He was the testator's physician ·from January, 1864, till the testator's death in January, 1874. He testifies, that having in view his examination of the testator, his intercourse with him and his observation of the éffect of his disease and medicine and declining years, he saw no particular reason to consider him a very different man from the time of his illness in 1867, down to the time of his last sickness, from what he was previously, according to his knowledge of him; that before his sickness in 1867, he considered him a man of fair mind and common sense; that he considered him a man of disposing mind and memory during that time; that after the sickness of 1867, the testator was, in the witness' judgment, of sound mind, and that he seemed to him to be very much the same mentally, as he had always known him to be, from thence to the close of his life. The testator labored under no delusion in reference to his wife. The evidence shows that he had been subjected to the treatment, at her hands, of which he complained. One of the terms of the settlement, which was proposed to him in her behalf, in June, 1873, was, that she should return his papers to him which she then still held. The transaction, in which he charged her niece, Kate Shaw, with violence towards him in the presence of his wife, was an actual occurrence, the particulars of which he detailed correctly. His forced retirement from his house to sleep in the barn for four or five nights, was no figment of his imagination, but a reality. The other

acts of his wife, of which he complained as having rendered his life miserable, are proved to have taken place. I cannot doubt that he had testamentary capacity when the will was executed, and I am satisfied from the testimony, that while in making the will he acted upon the suggestion and advice of his counsel, he was under no coercion or control ; that he acted voluntarily in all respects, and that the will was the offspring of his own volition.

The will is attacked on the ground that it is an unnatural will, because it makes no provision for his wife. But the evidence is clear that such a disposition was in accordance with his views as to his duty. He said she had had more than her share of his personal estate. At the time when the will was made, she had in her possession, and was withholding from him, his notes and bonds and mortgages and other evidences of debt, which she had surreptitiously, and against his will, taken away from him. In his then state of mind, arising from the occurrences between her and him before referred to, of which he complained, (and, as the weight of the testimony shows, not without reason,) a will, by which she was to be excluded from participation in his estate beyond her right of dower, of which he could not deprive her, was to be expected. Nor do I find from the evidence that the proponent and others, against whom the charge of fraud is made, are in any wise justly subject to the imputation. The will will be admitted to probate.

The case is one in which no costs should be awarded to the caveatrix. " It must," said the Ordinary, (Chancellor Green,) in *Perrine* v. *Applegate*, 1 *McCarter* 531, 538, " be an extreme case that would justify a court in giving costs to an unsuccessful party in contesting a will." See also *Collins* v. *Townley*, 6 *C. E. Green* 353. In addition to this consideration, there is still another leading to the same conclusion. The testimony in this case has been protracted to a most extraordinary and unnecessary extent, and very much of it is utterly incompetent. Under such circumstances, costs, which might otherwise have been given, will be denied. *Stultz* v. *Schaeffle*, 18 *Eng. L. & E.* 576, 598.